# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 03-324 |
| | : | |
| JAMES MCNAMARA, | : | CIVIL ACTION |
| Defendant. | : | |
| | : | NO. 06-3422 |
| | : | |

## Memorandum

YOHN, J.                                                                                    April 14, 2009

      James McNamara pleaded guilty to an eight count indictment charging conspiracy to possess stolen firearms in violation of 18 U.S.C. § 371, possession of stolen firearms in violation of 18 U.S.C. § 922(j), two counts of armed carjacking in violation of 18 U.S.C. § 2119, two counts of carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c), and two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  At sentencing, the court granted the government's § 5K1.1 motion, departed downward from the relevant sentencing guideline range, and sentenced defendant to the statutory mandatory minimum of thirty-two years[1] and, in addition, one month of incarceration, five years of supervised release, a fine of $3,500, and an $800 special assessment.

---

[1] Had the government not filed a § 5K1.1 motion, the sentencing guidelines would have added an additional 168-180 months to his sentence.

Defendant moves to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 because the government allegedly broke a promise to file a Rule 35[2] motion to reduce defendant's sentence below the statutory mandatory minimum term of imprisonment[3] and because his counsel was allegedly ineffective in pursuing the Rule 35 motion. The court will deny his motion for three reasons: (1) the majority of defendant's asserted claims are both untimely and covered by a valid collateral-attack waiver, (2) defendant was never promised a Rule 35 motion, and (3) his counsel was not ineffective in pursuing a Rule 35 motion.

## I.       FACTS AND PROCEDURAL HISTORY

After his arrest and indictment, McNamara provided information in a number of proffer sessions that led to the guilty pleas of Shawn Dunleavy, Patricia Branconi, and Anthony Henagan. McNamara also provided information to the government regarding an unsolved triple homicide, illegal trafficking in firearms, and police corruption. The information about the triple homicides was hearsay evidence that McNamara learned from Victor Enrique Soto while in prison awaiting trial. (Evidentiary Hr'g Tr. 14, Apr. 7, 2008 ("Evidentiary Hr'g Tr.").)

On August 8, 2003, prior to his guilty plea, McNamara met with the government, including Assistant United States Attorney Thomas P. Hogan, Jr. and two FBI agents—Pamelia Stratton and Michael Robinson. (*Id.* at 118.) McNamara's attorney, Thomas Ramsay, sought a

---

[2] Rule 35(b)(1) provides that "[u]pon the government's motion made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person."

[3] Under 18 U.S.C. § 3553(e), "[u]pon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense."

sentence below the mandatory minimum.  The government agreed to submit a § 5K1.1 motion

but  refused to go below the statutory mandatory minimum level because of the strength of its

case against McNamara, the seriousness of the crimes, and McNamara's significant criminal

record.  (*Id.* at 13.)  The government refused to consider a § 3553(e) departure based on the

information McNamara provided, and Hogan stated he was prepared to go to trial if McNamara

did not sign the plea agreement the government had proposed.  (*Id.* at 16-17, 122.)  McNamara

initially refused to sign the agreement because he wanted a term of imprisonment below the

mandatory minimum of thirty-two years.  (*Id.* at 53.)  McNamara claims that he was promised a

Rule 35 motion if he agreed to plead guilty.  Hogan testified, however, that he told McNamara

only that the government would follow up on the leads McNamara provided and that, if they

resulted in a prosecution (e.g., if they "hit"), the government would file a Rule 35 motion.  (*Id.*)

Ramsay likewise testified that the government represented that a future Rule 35 motion would

depend on additional developments in the cases for which McNamara had provided information

or in which McNamara might testify.  (Evidentiary Hr'g Tr. 55-58, 111-12, April 3, 2008

("Ramsay Test.").)

Numerous letters that Ramsay wrote, some of which he sent to McNamara and some of

which he sent to Hogan, confirm that the future prospect of a Rule 35 motion depended on

additional developments in the government's investigations.  (*See, e.g.*, Def. Exs. 7, 10, 17, 19.[4])

---

[4] For example, on July 8, 2003, Ramsay wrote a letter to McNamara referring to the 32
year mandatory minimum in the plea agreement as an "initial offer . . . that, *depending on your
level of cooperation* in the ongoing triple homicide investigation . . . *could* change for the better."
(Def. Ex. 7 (emphasis added).)  Ramsay also wrote: "Again, if (and that is a big if) your
information proves to be of such great value and assistance and same leads to a successful
prosecution and/or plea agreement, you could receive a sentence of far less than 32 years."  *Id.*
(underlining in original).

The letters also confirm that Ramsay advised McNamara that a Rule 35 motion was not

guaranteed; rather, any such motion was to be conditioned on future developments.  (*See, e.g.*,

Def. Ex. 7, 12, 13.[5])  On Ramsay's advice and after a telephone conversation with his parents,

McNamara signed the guilty plea agreement.  (Evidentiary Hr'g Tr. 124.)

The plea agreement required McNamara to cooperate fully and completely with the

government's investigation of crimes of which he had knowledge.  (Plea Agreement ¶ 5.)  The

plea agreement notified McNamara that "as of the date of this agreement, the government does

not intend to move for departure from any statutory mandatory minimum term of imprisonment"

and that McNamara would "be required to serve at least the 32-year mandatory minimum term of

imprisonment."  (*Id.* ¶ 6.b.)  McNamara also "voluntarily and expressly waive[d] all rights to

appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to

---

On August 13, 2003, Ramsay sent a letter to Hogan that suggested an understanding that a potential Rule 35 motion was conditioned on a successful prosecution of the triple homicide case.  (Def. Ex. 10.)

On March 25, 2004, Ramsay sent a letter to Hogan containing the following language: "We all greatly appreciate the sincere manner in which you outlined your intentions to follow through on all of the pending investigations and *to do the very best that you can to file a Rule 35 Motion in this case if deemed appropriate*."  (Def. Ex. 17 (emphasis added).)

On October 26, 2004, Ramsay wrote to McNamara: "[Hogan] told me that he was 'not in a position' to file [a Rule 35] Motion at this juncture but that it was certainly 'not out of the question.'"  (Def. Ex. 19.)

[5] For example, on September 9, 2003, Ramsay sent a letter to McNamara stating "based on Tom Hogan's statements . . . I remain optimistic that you will ultimately obtain a reduction in sentence."  (Def. Ex. 12.)  While Ramsay may have optimistically expected the government to file a Rule 35 motion, his language again confirms that a Rule 35 motion was not guaranteed.

On October 10, 2003, Ramsay wrote to McNamara: "As before, if their efforts [investigating the triple homicide] prove fruitful, you will be rewarded accordingly."  (Def. Ex. 13.)

this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. §

3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law."[6]  (*Id.* ¶ 11.)

On September 4, 2003, McNamara pleaded guilty to eight counts pursuant to the plea

agreement.  McNamara had expressed hesitation to Ramsay prior to the change of plea hearing.

(Def. Ex. 9; Ramsay Test. 47-48.)  Ramsay advised McNamara that he could receive a sentence

greater than the mandatory minimum if the case went to trial.  (Ramsay Test. 46-47.)  Ramsay

also told McNamara that if he mentioned the discussion about a Rule 35 motion, the government

might not file it.  (Evidentiary Hr'g Tr. at 130-32.)  During the plea colloquy, McNamara did not

mention any agreement regarding a Rule 35 motion to the court.[7]  The court assured itself that

McNamara understood he was facing a minimum sentence of thirty-two years in prison and that

the court had no flexibility in that matter.  (*Id.* at 132.)  McNamara was sentenced on March 19,

---

[6] The waiver provision was subject to a limited set of exceptions (Plea Agreement ¶ 11.a.-b.) under which defendant reserved his appellate rights in certain, limited circumstances.  None of these exceptions is relevant to defendant's § 2255 motion.

[7] After Hogan summarized the plea agreement in open court, the court confirmed: (1) that McNamara agreed to the accuracy of the summary, (2) that McNamara understood that the written plea agreement, not the summary, constituted the actual plea agreement, (3) that McNamara read and understood the plea agreement, (4) that McNamara had time to discuss the agreement with his attorney and to decide to plead guilty under the agreement, and (5) that McNamara signed, understood, and agreed to the agreement.  The following exchange then took place between the court and McNamara:

> Q:     Has anybody forced you or threatened you in any way to get you to plead guilty?
> A:     No, Your Honor.
> Q:     Has anybody made any promises to you other than the terms of the plea agreement to get you to plead guilty?
> A:     No, Your Honor.

(Tr. Change Plea Hr'g 20:18-23, Sept. 4, 2003.)

Earlier in the hearing, the court asked McNamara whether anyone had instructed him to respond other than truthfully to any of the court's questions.  McNamara responded: "No, Your Honor."  (Tr. Change Plea Hr'g 3:25-4:2.)

2004.  The court accepted the government's § 5K1.1 motion and sentenced McNamara to thirty-two years and one month of incarceration.  The government's § 5K1.1 motion was based on McNamara's cooperation, up to the date of sentencing, in the multiple criminal investigations discussed above.  The court entered judgment of sentence on March 22, 2004, and without appeal, it became final on April 6, 2004.[8]

After the change of plea hearing and after sentencing, Ramsay continued to ask Hogan about the status of the investigations.  Hogan informed Ramsay that the investigations were ongoing.  (Def. Exs. 13, 17, 19.)  Hogan personally followed up on the investigations.  (Evidentiary Hr'g Tr. 19, 60-62.)  For example, Hogan referred the triple homicide information to the Philadelphia Police Department and discussed it with the department's homicide unit.  Hogan, along with Agent Stratton, also personally interviewed the source of McNamara's information.  (*Id.* at 19.)

Hogan also told Ramsay that, out of fairness to McNamara and conditioned on the court's acceptance, the one-year window to file a Rule 35 motion would not be an impediment to the filing of a motion by the government after the one-year window elapsed.  (*Id.* at 64.)  In January 2005, Hogan notified Ramsay that "the matter is not ripe for a Rule 35 motion."  (Ramsay Test.

---

[8] The court determined the date the judgment became final as follows: The Third Circuit has stated that "[i]f a defendant does not pursue a timely direct appeal to the court of appeals, his or her conviction and sentence become final, and the [§ 2255] statute of limitation begins to run, on the date on which the time for filing such an appeal expired."  *Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999).  Under Federal Rule of Appellate Procedure 4(b)(1)(A)(I), McNamara had 10 days from the entry of judgment to file an appeal.  Under Appellate Rule 26(a)(2), Saturdays, Sundays, and legal holidays are excluded from the computation of periods of less than 11 days.  Accordingly, after excluding the 4 weekend days that fell within the 10 weekdays following March 22, 2004, McNamara had until April 5, 2004 to appeal the judgment against him.  Thus, for purposes of § 2255, the judgment against McNamara became final when his time to appeal expired on April 6, 2004.

95.) By mid-August 2005, however, the triple homicide and police corruption investigations had ended without success, and Hogan informed Ramsay that the government would not file a Rule 35 motion. (Ramsay Test. 105; Evidentiary Hr'g Tr. 142.) McNamara then prepared and filed his present motion on August 2, 2006. The court held hearings on the motion on April 3 and 7, 2008, followed by supplemental briefing by both parties.

## II. DISCUSSION

### A. Timeliness

In his motion, McNamara raises multiple claims of ineffective assistance of counsel as well as a claim for prosecutorial misconduct/breach of promise to file a Rule 35 motion. The motion is timely as to the claim for prosecutorial misconduct/breach of promise and as to one ineffective assistance claim that relates to the prosecutorial misconduct claim. McNamara's motion is untimely as to his other ineffective assistance of counsel claims.

The government argues that McNamara's entire motion is untimely under 28 U.S.C. § 2255(f), which provides:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—(1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Because defendant filed his motion on August 2, 2006, well over one year after his conviction became final, the government argues that the entire motion is untimely under § 2255(f)(1).

The government, however, apparently ignores that § 2255(f) explicitly states that the limitation period begins to run "*from the latest of*" the four dates described in subsections (f)(1)-(4). *Id.* (emphasis added.)  Defendant argues that his motion is timely under either subsection (f)(2) or (f)(4), and the government has failed to address these timeliness arguments.

### 1.    Ineffective Assistance of Counsel Claims not Related to the Prosecutorial Misconduct/Breach of Promise Claim

In his § 2255 motion, McNamara raised four grounds for ineffective assistance of counsel.  One of these claims relates to McNamara's prosecutorial misconduct/breach of promise claim.  The other three ineffective assistance counsel claims are independent of the government's alleged misconduct.  The three unrelated claims are: (1) that Ramsay "never properly reviewed or explained in total the constricting consequences of a guilty plea, specifically the waiver of appellate rights provision;" (2) that Ramsay incorrectly informed McNamara "that he could appeal his sentence if he did not receive a resentence of half the mandatory minimum sentence" (emphasis omitted); and (3) that Ramsay improperly "advised [McNamara] not to mention Prosecutor Hogan's promise to file a Rule 35(b), if asked [at the change of plea colloquy], otherwise he might forfeit his chances of receiving the motion."  (Mem. Supp. § 2255 Motion 3-4.)[9]  These claims are based on allegations that were known or knowable to McNamara at the

---

[9] In his counseled reply memorandum, defendant alleges additional areas of ineffectiveness on the part of Ramsay including: (1) that "Ramsay failed to advise Defendant of the intent element of the federal carjacking statute and the implications of this requirement for his likelihood of success at a trial by jury;" (2) that "Ramsay failed to advise Defendant that a conviction under 18 U.S.C. 924(c) . . . required that a jury find that he possessed, used, or carried a firearm in relation to a 'crime of violence;'" (3) that "Ramsay pressured McNamara to plead guilty;" (4) that Ramsay's "failure to communicate with Defendant . . . render[ed] Defendant's plea agreement not 'knowing and voluntary;'" and (5) that Ramsay "incorrectly advised Defendant" about his ability to appeal, should the government "fail to perform its promise to file a Rule 35 motion."  (Def.'s Reply Mem. Further Supp. Def.'s § 2255 Mot. and Opp'n Gov't's

time the judgment against him became final.  Thus, these claims do not fall under § 2255(f)(4).

Nor did the government impede McNamara from earlier bringing these claims, so they do not fall

under § 2255(f)(2).  Nor are these other claims based on some right, newly recognized by the

Supreme Court and made retroactively applicable to cases on collateral review, so they do not

fall under § 2255(f)(3).  Therefore these remaining ineffective assistance of counsel claims must

fall under § 2255(f)(1).  Having been raised more than one year after the judgment against

defendant became final, these claims are untimely and time-barred.

### 2.    Prosecutorial Misconduct/Breach of Promise Claim and Related Ineffective Assistance of Counsel Claim

Regarding defendant's claim for prosecutorial misconduct/breach of promise, the court

agrees with defendant that his motion is timely under § 2255(f)(4).  The facts supporting that

claim did not arise until mid-August 2005, when defendant learned that the government would

not be filing a Rule 35 motion.  Defendant could not have discovered this fact earlier, and his

August 2, 2006 filing is therefore within the 1-year limitation period of § 2255(f)(4).

As mentioned above, one of defendant's four ineffective assistance of counsel claims is

derivative of his prosecutorial misconduct/breach of promise claim.  Specifically, McNamara

claims that Ramsay "repeatedly assured" him "that Prosecutor Hogan could and would file a

Rule 35(b) motion."  (Mem. Supp. § 2255 Motion 3-4.)  This claim is also timely under §

---

Resp. 28-30.)  It is unclear whether defendant raised these allegations solely to support his
argument that his plea agreement was not knowing and voluntary or whether defendant was
attempting to assert additional claims for ineffective assistance of counsel.  Assuming, without
deciding, that McNamara intended these allegations to be additional ineffective assistance
claims, the court notes that those claims would likely relate back to the filing date of his original
§ 2255 motion under *Hodge v. United States*, 554 F.3d 372, 377-78 (3d Cir. 2008).  In any event,
they are untimely, regardless of relation back, and they were not addressed at the evidentiary
hearing so there is no evidentiary basis to support them.

2255(f)(4).  That is, McNamara did not know that Rasmay may have been ineffective in pursuing or securing a Rule 35 motion (or that Ramsay's assurances to McNamara that a Rule 35 motion would be forthcoming may have been faulty) until McNamara learned that a Rule 35 motion would not, in fact, be forthcoming.  In that regard, just as the prosecutorial misconduct/breach of promise claim is timely under § 2255(f)(4), so is this related claim for ineffective assistance of counsel.

### B.      Waiver

McNamara knowingly and voluntarily entered into a plea agreement that included a provision waiving his right to collaterally attack his conviction and sentence using § 2255.  The agreement provided that "the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under . . . 28 U.S.C. § 2255, or any other provision of law."  (Plea Agreement ¶ 11.)  The court's colloquy with defendant confirmed that his waiver of collateral attack rights was knowing and voluntary,[10] and enforcing the waiver would not cause a miscarriage of justice.  Thus, even if the three ineffective assistance

---

[10] During the change of plea colloquy, the court questioned defendant, and he answered, as follows:

Q       Now, also, ordinarily after an appeal is over and your conviction is final, you
        have the right to bring later proceedings known as a collateral attack by filing
        a habeas corpus motion to vacate, set aside or correct your sentence under
        Section 2255, the statute.  Your guilty plea agreement absolutely prohibits
        you from using this later proceeding under Section 2255.
        Do you understand this?
A       Yes, Your Honor.
Q       So you're not allowed to do that at all.  Do you understand that?
A       Yes, Your Honor.

(Tr. of Change of Plea Hr'g 17.)

claims discussed in section II.A.1., above, were not time-barred, defendant's waiver would preclude him from now seeking relief under § 2255.

If a defendant, as part of a plea bargain, waives his right to appeal or collaterally attack a judgment, that waiver will be enforced absent a miscarriage of justice.  "[W]aivers of appeals are generally permissible if entered into knowingly and voluntarily, unless they work a miscarriage of justice."  *Khattak v. United States*, 273 F.3d 557, 558 (3d Cir. 2001); *see also id.* at 563 (quoting *United States v. Teeter*, 257 F.3d 14, 26 (1st Cir. 2001)) (setting out a five-factor test). The miscarriage-of-justice standard applies not only to waivers of appeals, but also to waivers of collateral attacks.  *See United States v. Mabry*, 536 F.3d 231, 241 (3d Cir. 2008) (holding the test for validity of a collateral-attack waiver "examines [the waiver's] knowing and voluntary nature and asks whether its enforcement would work a miscarriage of justice"); *United States v. Shedrick*, 493 F.3d 292, 297, 298 n. 6 (3d Cir. 2007); *United States v. Robinson*, 244 Fed. App'x. 501, 504 (3d Cir. 2007); *see also Gonzalez v. United States*, No. 07-1797, 2007 WL 2407288, at *2 (E.D. Pa. Aug. 20, 2007) ("In the recent case of *United States v. Shedrick*, the court of appeals implicitly held that collateral-waiver provisions are generally enforceable unless their enforcement would result in a miscarriage of justice.").

Regarding whether enforcement of a waiver would work a miscarriage of justice, the Third Circuit, in *Khattak*, 273 F.3d at 563, and *Mabry*, 536 F.3d at 242, endorsed the First Circuit's approach in *United States v. Teeter*, 257 F.3d 14, 25-26 (1st Cir. 2001).  The *Teeter* court recognized that:

> the term "miscarriage of justice" is more a concept than a constant. Nevertheless, some of the considerations come readily to mind: the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of

correcting the error on the government, and the extent to which the defendant acquiesced in the result. Other considerations doubtless will suggest themselves in specific cases.

*Teeter*, 257 F.3d at 26.

Thus, under *Mabry*, knowing and voluntary collateral-attack waivers are generally enforceable unless enforcement would cause a miscarriage of justice.  The Third Circuit has implied that defendants may seek habeas relief for some potentially viable ineffective assistance of counsel claims, notwithstanding collateral-attack waivers:  "Enforcing a collateral-attack waiver where constitutionally deficient lawyering prevented [the defendant] from understanding his plea . . . would result in a miscarriage of justice."  *Shedrick*, 493 F.3d at 298.

A defendant may not, however, circumvent a collateral-attack waiver simply by claiming ineffective assistance of counsel.  A waiver will be enforced if the claim is not potentially viable. *Compare id.* at 301 (invalidating a collateral-attack waiver as to a failure-to-timely-appeal claim, where the record "clearly reflects" counsel's deficiency), *with id.* at 300 (enforcing a collateral-attack waiver as to a failure-to-explain-the-plea-agreement claim because "it is inconceivable" that the defendant was unaware of the maximum sentence), *and United States v. Robinson*, 2007 WL 2253423, at *2 (upholding a collateral-attack waiver as to a failure-to-explain-the-plea-agreement claim because the record reflected both counsel's explanation of the agreement to the defendant and a thorough plea colloquy).

As the Third Circuit stated in *Mabry*, "a district court has an independent obligation to conduct an evaluation of the validity of a collateral waiver."  536 F.3d at 238.  Based on the record, specifically the guilty plea agreement and the change of plea colloquy, I have no doubt that McNamara's collateral-attack waiver was knowing and voluntary.  To paraphrase the

12

*Shedrick* court, "[g]iven this record, it is inconceivable that [McNamara] did not know" that he faced a 32-year mandatory minimum sentence under the plea agreement he signed.[11]  The change of plea colloquy included an explanation of both the mandatory minimum sentence that McNamara faced and the collateral-attack waiver.  After the court confirmed McNamara's understanding of the agreement, he decided to plead guilty pursuant to the agreement, including the collateral-attack waiver.

Furthermore, enforcement of the waiver would not cause a miscarriage of justice.  At sentencing and pursuant to the government's § 5K1.1 motion, the court departed downward from the sentencing guidelines and imposed a sentence virtually as low as the applicable mandatory minimum.  In other words, McNamara received the benefit of his bargain in the plea agreement, a departure from the sentencing guidelines pursuant to the government's § 5K1.1 motion.  That McNamara never ultimately benefitted from a Rule 35 motion—the possible filing of which (as discussed in section II.C., below) was never guaranteed but, rather, was conditioned on some further development in the investigations for which McNamara provided information—can not

---

[11] The plea agreement explicitly mentioned that McNamara's sentence was subject to "32 years mandatory minimum imprisonment consecutive to guidelines sentence."  (Plea Agreement ¶ 8.i.)  The agreement also stated that "the defendant will be required to serve at least the 32-year mandatory minimum term of imprisonment" and that "the government does not intend to move for departure from any statutory mandatory minimum term of imprisonment."  (Plea Agreement ¶ 6.b.)  Moreover, during the change of plea colloquy, the court questioned McNamara, and he answered, as follows:

> Q:    Counts 4 and 6 are counts charging use of a firearm during and in relation to a crime of violence.  On Count 4, I can—I must send you to jail for at least seven years.  It can be consecutive to any other sentence imposed.  And on Count 6, I must send you to jail for at least 25 years, and it can be up to life, and that 25 years is consecutive to any sentence on the other charges plus its consecutive to seven years on Count 4.  Do you understand that?
>
> A:    Yes, Your Honor.

(Tr. of Change of Plea Hr'g 10:1-11.)

be considered a miscarriage of justice. *See, e.g.*, *Mabry*, 536 F.3d at 244 (finding that, under appropriate facts, enforcement of a waiver was "in line with justice, not a miscarriage of it."). Thus, in addition to being untimely, the three ineffective assistance of counsel claims addressed in section II.A.1. are not potentially viable.

In summary, the plea agreement explicitly explained the waiver, and, independent of any discussions McNamara may have had with Ramsay, the court confirmed at the change of plea colloquy that McNamara understood the waiver. The collateral-attack waiver was knowing and voluntary, and enforcement of the waiver would not work a miscarriage of justice. The court will, therefore, enforce the waiver and hold that McNamara is precluded from raising the three claims addressed in section II.A.1.

However, the court will assume, without deciding, that McNamara did not prospectively waive collateral-attack rights as to his two claims that are not time-barred. These two claims—the prosecutorial misconduct/breach of promise claim and the related ineffective assistance claim—are based on events that occurred after McNamara entered his guilty plea. Many of the facts underlying these claims had not yet occurred at the time of the change of plea colloquy, and the court will assume, without deciding, that the collateral-attack waiver did not cover future events. Accordingly, the court will address the merits of McNamara's claim for prosecutorial misconduct/breach of promise and the related ineffective assistance claim.

### C.     Merits of McNamara's Claims

Regardless of waiver, defendant's motion on the two remaining claims fails on the merits. Under 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct his sentence if "the sentence was imposed in violation of the Constitution or laws of the

United States." 28 U.S.C. § 2255.  McNamara claims that his guilty plea was constitutionally deficient because his counsel was inadequate and because the government acted in bad faith when it induced him to accept the agreement and later breached a promise to file a Rule 35 motion.

### 1.   Hogan Did Not Breach a Promise or Act in Bad Faith

Defendant asserts that Assistant U.S. Attorney Hogan acted in bad faith by "dangling" the Rule 35 motion in front of McNamara both before and after McNamara agreed to plead guilty. This argument is without merit.  Hogan never promised McNamara a Rule 35 motion.  Three government witnesses testified credibly at the hearing that there was no promise to file a Rule 35 motion.  (*See* Evidentiary Hr'g Tr. 53, 82-83, 100.)  Ramsay likewise testified that there was no express agreement.  (Ramsay Test. 52-54.)  Any possibility of a Rule 35 motion was contingent on McNamara's proffer about the triple homicide "hitting"—i.e., resulting in an arrest or prosecution.  McNamara's original motion stated this fact, as he himself asserted that the Rule 35 motion was promised in the event of a "fruitful outcome of an ongoing investigation."  (§ 2255 Mot. 6.)  Thus, any potential Rule 35 motion was always contingent on post-sentencing assistance.[12]

Hogan pursued the investigation of the leads McNamara provided.  Hogan met with or spoke with state and federal investigators multiple times to ensure that the investigation was continuing.  (Evidentiary Hr'g Tr. 18-20, 60-62, 97-100.)  Although it is possible to file a Rule

---

[12] Furthermore, it is implausible that Hogan would have disingenuously continued to "dangle" the Rule 35 motion in front of McNamara *after* McNamara pleaded guilty pursuant to the plea agreement.  Hogan's conduct after McNamara pleaded guilty suggests that Hogan intended to file a Rule 35 motion if the information led to prosecution or other beneficial developments in the investigation.

35 motion for post-sentencing cooperation that falls short of arrests, *see United States v. Foisy*, No. 04-0020-2, 2006 WL 42402 (E.D. Pa. Jan. 6, 2006), McNamara had already been credited for the information he provided to facilitate the investigations during the pre-sentencing proffers. Something else had to happen for the government to file a Rule 35 motion. Had prosecutions ensued in the triple homicide or the police corruption case based on McNamara's proffer, the government would have been in a position to file a Rule 35 motion.

McNamara also argues that Hogan improperly represented that the one year deadline under Rule 35 was unimportant and that the government routinely files late motions under Rule 35. For several reasons, this argument does not entitle McNamara to relief. First, Rule 35(b)(2) does provide for later filing of a motion. Second, even if the late -filing provisions are not technically met, the court has observed that such motions have been filed after one year by the United States Attorney's Office. Third, the issue is moot in this case because no Rule 35 motion was ever filed at any time.

McNamara's argument that the government could not have sought a Rule 35 motion, and thus acted in bad faith, because such a motion would have been based on pre-sentence (rather than post-sentence) cooperation is at odds with the facts of this case. The government rewarded defendant with a § 5K1.1 motion for his cooperation prior to sentencing. At sentencing, the court acknowledged that any additional assistance or development could later be credited to defendant pursuant to a Rule 35 motion. (*See* Sentencing Tr. 5, Mar. 19, 2004.) Hogan did not promise McNamara a Rule 35 motion for his presentence cooperation, but conditioned a potential Rule 35 motion on post-sentencing assistance—such as a "hit" on the proffered

information leading to additional assistance or testimony in the government's prosecution of crimes.[13]

McNamara's argument that the plea agreement required additional cooperation, thus precluding an additional Rule 35 motion based on the same crimes, is also without merit.  Under the plea agreement, the continuing benefit of the § 5K1.1 downward departure based on the proffered information hinged on defendant's continuing cooperation, but that did not preclude the government from filing a motion for a Rule 35 reduction if the investigations bore fruit or McNamara otherwise provided additional assistance in the case.  The cases cited by McNamara that distinguish between pre- and post-sentence cooperation are not to the contrary.  *See, e.g.*, *United States v. Awad*, 371 F.3d 583, 588-89 (9th Cir. 2004) (holding that the government may not refuse to evaluate a portion of the pre-sentence assistance until after sentencing); *United States v. Martin*, 25 F.3d 211, 215-16 (4th Cir. 1994) (holding that the government may not defer its § 5K1.1 determination until after sentencing to induce additional cooperation); *United States v. Drown*, 942 F.2d 55, 58-59 (1st Cir. 1991) (holding that the government may not delay a § 5K1.1 motion until after sentencing for assistance provided before sentencing).[14]

---

[13] The court notes that if McNamara is correct in his contention that a Rule 35 motion was never legally possible because he rendered all of his cooperation prior to sentencing, then the issue would have been ripe when the judgment against him became final and, therefore, would now be time-barred under § 2255(f)(1).  In any event, I conclude that a Rule 35 motion can be filed by the government and granted by the court based on information given by the defendant prior to his sentencing if that information later leads to a prosecution or conviction of others or is later helpful in the investigation of others.  If that were not correct, the court would have to wait an interminable period of time to learn whether the information did result in the prosecution or conviction of others before sentencing the defendant.

[14] The court notes that if the government had refused to fully value McNamara's cooperation prior to sentencing, then it would have run afoul of § 5K1.1.  *See, e.g.*, *Awad*, 371 F.3d at 588-89; *Drown*, 942 F.2d at 58-59.  Likewise, if the government had promised a Rule 35

McNamara's case is unlike *Martin* and *Drown*, which he cited in support of his argument. (§ 2255 Mot. 4.)  In *Martin* and *Drown*, the prosecutors had impermissibly decided *not* to file § 5K1.1 motions at the respective sentencings because, in large part, the prosecutors planned to later use Rule 35 to seek downward departure for all cooperation (both pre- and post-sentencing). *Martin*, 25 F.3d at 216; *Drown*, 942 F.2d at 59.  Given the temporal distinctions between § 5K1.1 and Rule 35, both courts held that "the government may not predicate its decision to defer a . . . § 5K1.1 motion on the fact that it will make a [Rule 35(b)] motion after sentencing."  *Martin*, 25 F.3d at 216 (citing and summarizing the holding of *Drown*, 942 F.2d at 59).  While recognizing the temporal distinctions between motions under § 5K1.1 and Rule 35, the *Drown* court also explained that it is not improper for prosecutors, at the time of sentencing, to contemplate the potential for Rule 35 motions in the future without committing to such motions.  Specifically, the court stated:

> Nor do we mean to imply that, at the original sentencing, a prosecutor must necessarily buy a pig in a poke; at that stage, the government may, if the situation warrants, permissibly conclude that a defendant's presentence cooperation has not been "substantial" for purposes of section 5K1.1 on the basis that the help provided has yet to bear fruit.  But, the government may not defer a determination as to the substantiality of a defendant's assistance on the ground that it would be premature to make such a judgment.  At the time of sentencing, a yes-or-no decision must be made on whether to file a section 5K1.1 motion; and that decision must be based on a good faith evaluation of the assistance rendered to that date.

---

motion based on pre-sentence cooperation, it would have confused the temporal distinction between § 5K1.1 and Rule 35 motions. *See, e.g.*, *United States v. White*, 71 F.3d 920, 926-27 (D.C. Cir. 1995); *United States v. Gangi*, 45 F.3d 28, 30 (2d Cir. 1995).  The facts remain, however, that the government fully credited McNamara with the value of his pre-sentence cooperation and refused to promise a Rule 35 motion unless *something* additional occurred after sentencing—most likely a prosecution based on a "hit" from McNamara's proffer that would lead to or require additional assistance.

*Drown*, 942 F.2d at 59 n. 7.  In McNamara's case, the government reached that "yes-or-no decision" in the affirmative, filing a § 5K1.1 motion based on McNamara's pre-sentence cooperation.  Further downward departure was possible pursuant to Rule 35 if the information that McNamara provided "hit," but a Rule 35 motion was not guaranteed.

The government's deferral on § 5K1.1 motions in both *Martin* and *Drown* caused the defendants to be denied any benefit of their cooperation, through no fault of their own.  *Martin*, 25 F.3d at 216-17; *Drown*, 942 F.2d at 59-60; *see White*, 71 F.3d at 926-27 (noting *Drown* and *Martin* were concerned with the equities of ensuring the cooperating defendants received some credit).  There is no threat of such inequity here.  McNamara was fully credited with all of the assistance he provided through the § 5K1.1 motion.  The government moved for, and McNamara received, a downward departure virtually to the statutory minimum sentence.  Hogan suggested that if the information for which McNamara was credited in the § 5K1.1 motion later provided additional assistance to the government, McNamara might receive the benefit of a Rule 35 motion.  There was nothing improper with that suggestion.  McNamara had already received a substantial downward departure, via § 5K1.1, based on the information he provided, and none of the information "hit" post-sentencing, meaning that no post-sentencing substantial assistance developed to justify a Rule 35 motion.  The factual predicate to a potential Rule 35 motion was always that *something* had to occur after sentencing—e.g., a prosecution in which McNamara provided assistance or some other event not included in the substantial § 5K1.1 reduction.  No such later development occurred.[15]

---

[15] There is no evidence that Hogan intended not to carry out his commitment to file a Rule 35 motion if the homicide investigation bore fruit, and I specifically find that he did not have such an intent.  Rather, he wanted to help the defendant if he could.

## 2.    Ramsay's Representation Was Not Ineffective

McNamara asserts that Ramsay was ineffective in several ways.  As discussed in section II.A.1., above, the majority of McNamara's ineffective assistance claims are time-barred.  His remaining ineffective assistance claim—that Ramsay improperly advised him regarding the certainty or future availability of a Rule 35 motion or ineffectively pursued such a motion—fails on the merits.

To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficiency, a defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms."  *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir. 1999) (citing *Strickland*, 466 U.S. at 688).  To prove prejudice, a defendant must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.  Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Reasonable probability means "a probability 'sufficient to undermine confidence in the outcome.'"  *Rolan v. Vaughn*, 445 F.3d 671, 683 (3d Cir. 2006) (quoting *Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999)).  "The right to effective assistance of counsel extends to plea negotiations."  *United States v. Gould*, No. 97-3090, 1997 WL 535821, at *4 (E.D. Pa. July 29, 1997) (citing *Hill v. Lockhart*, 474 U.S. 52 (1985)).

20

The Supreme Court has explained that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.  The Court further stated that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.  There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the defendant has the burden of overcoming "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

That presumption, however, rests on counsel's fulfillment of his duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.  "Only choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity," *Rolan*, 445 F.3d at 682, and "choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," *Strickland*, 466 U.S. at 691.

There is no evidence to support the contention that Ramsay was deficient, for purposes of an ineffective assistance of counsel claim, in his efforts to secure a Rule 35 motion for McNamara.  McNamara has submitted no evidence, for example, that an attorney practicing at or above "an objective standard of reasonableness under prevailing professional norms," *Buehl*, 166 F.3d at 169, would have secured such a motion or that Ramsay somehow fell below such a standard in failing to secure a Rule 35 motion.  Moreover, the evidence showed that Ramsay communicated to McNamara that any future Rule 35 motion would be conditioned on some further development or assistance.  (Def. Exs. 7, 12, 13.)  Unfortunately for McNamara, there

were no further developments, so he was not able to benefit from a Rule 35 motion.  That the government never ultimately moved under Rule 35 did not render Ramsay's performance deficient.[16]

Even if Ramsay had been deficient, McNamara suffered no prejudice.  First, there was no agreement to file a Rule 35 motion.  Clearly, the government was not going to agree to move for a sentencing reduction below the mandatory minimum based solely on the pre-sentencing proffer.  Second, independent of any advice from Ramsay, the court confirmed at the change of plea colloquy that McNamara entered into the plea knowingly and voluntarily.  McNamara was personally aware of the potential for a Rule 35 motion, the fact that it was not in the plea agreement, and the fact that something else had to occur before the government would consider recommending a sentence below the mandatory minimum.  McNamara's pre- and post-plea correspondences evidence that he understood that the Rule 35 motion was not part of the plea agreement pursuant to which he knowingly and voluntarily pleaded guilty.  (Evidentiary Hr'g 126.)  His displeasure with the fact that he did not ultimately benefit from a Rule 35 motion does not mean that his agreement was not voluntary and knowing.  The court sentenced McNamara to nearly the statutory minimum, well below the applicable guideline range.  The government upheld its plea agreement with McNamara, and he is not entitled to relief under § 2255.

### D.    No Certificate of Appealability

---

[16] The court notes, without deciding, that a potential deficiency could have arisen from McNamara's failure, on Ramsay's advice, to notify the court of Hogan's promise to follow up with the investigations for which McNamara had provided information.  Even if Ramsay's advice on this matter was deficient, however, there was no prejudice because (1) McNamara knew it would not be on the record and (2) Hogan did, in fact, follow up on the investigations.

22

The court will also deny defendant's request of a certificate of appealability. A court may issue a certificate of appealability only if the defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires that the defendant "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, the court has determined that on the basis of the record before the court, defendant's claims are without merit. The court is persuaded that reasonable jurists would not find this assessment debatable or wrong. Therefore, defendant has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not issue.

## III.    CONCLUSION

In summary, the majority of defendant's claims are time-barred and precluded by a valid collateral-attack waiver. Two of his claims are not time-barred: his claim of prosecutorial misconduct/breach of contract and the related ineffective assistance of counsel claim. Even assuming these claims are not precluded by the collateral-attack waiver, they fail on the merits. The court will, therefore, dismiss defendant's motion as to the time-barred claims and deny the motion as to the remaining claims.

An appropriate order follows.